

**FILED**
5/11/2021  AJS
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

HYTERA COMMUNICATIONS
CORPORATION, LTD.,
  also known as "Guo Yixiang,"
GEE SIONG KOK,
  also known as "Guo Yixiang,"
YIH TZYE KOK,
  also known as "Guo Yijie,"
SAMUEL CHIA HAN SIONG,
  also known as "Xie Hanxiong,"
PHAIK EE OOI,
  also known as "Peiyi Huang,"
WONG KIAT HOE,
  also known as "Ken Wong,"
YU KOK HOONG,
  also known as "You Guoxiong," and
CHUA SIEW WEI,
  also known as "Eunice Chua."

Case No. 20 CR 688

Violations: Title 18, United States
Code, Sections 1832(a)(3), 1832(a)(4),
1832(a)(5), and 2.

**Judge Tharp**
**Magistrate Judge McShain**

 **UNDER SEAL**

The SPECIAL NOVEMBER 2019 GRAND JURY charges:

**COUNT ONE**

1.    At times material to this Indictment:

    a.    Motorola Solutions, Inc. ("Motorola") was a telecommunications company headquartered in Chicago with offices worldwide, including Malaysia.

    b.    Among other products, Motorola manufactured and sold digital mobile radios (DMRs) throughout the United States, including the Northern District of Illinois, and internationally.

1

c. HYTERA COMMUNICATIONS CORPORATION, LTD. ("HYTERA") was a telecommunications company headquartered in Shenzhen, China.

**DMR Technology**

d. Motorola sold mobile radios and digital mobile radios ("DMRs"). These radios are at times referred to as "walkie-talkies."

e. Prior to the implementation of DMR technology, both Motorola and HYTERA marketed and sold mobile radios that relied on analog technology to transmit and receive communications.

f. In approximately December 2004, the United States Federal Communications Commission ("FCC") announced that, by 2013, mobile radios would be required to operate on a narrower bandwidth, effectively requiring manufacturers to shift from analog to digital technology.

g. Motorola began developing DMR products to meet the FCC requirements in approximately 2004.

h. Hundreds of Motorola employees spent years developing the hardware and software solutions to design, manufacture, market, and sell DMRs.

i. By 2007, Motorola marketed and sold DMR products in the United States, and elsewhere, including the Northern District of Illinois.

j. Motorola's DMR products generally were marketed and sold to clients like taxi companies, small police units, hotels, and airports.

k.     Beginning in or about May 2010, HYTERA began selling DMR products in the United States, including in the Northern District of Illinois, through its wholly owned U.S. affiliate companies.

### The Defendants

l.     GEE SIONG KOK ("G.S."), YIH TZYE KOK ("Y.T."), SAMUEL CHIA HAN SIONG ("CHIA"), PHAIK EE OOI ("OOI"), WONG KIAT HOE ("WONG"), YU KOK HOONG ("HOONG"), CHUA SIEW WEI ("CHUA") (collectively, the "INDIVIDUAL DEFENDANTS" and with HYTERA, the "DEFENDANTS") are former employees of Motorola who worked on Motorola's DMR products and were recruited to work for HYTERA between 2008 and 2009.

m.     G.S. began working for Motorola on or about February 10, 2003 and worked in Malaysia as a Senior Engineering Manager responsible for DMR products. G.S. submitted his resignation letter to Motorola on December 31, 2007 and resigned effective February 11, 2008. On or about February 1, 2008, G.S. began working for HYTERA in Shenzhen, China as a Director of Research and Development. At HYTERA, G.S. reported directly to HYTERA's CEO.

n.     Y.T. began working for Motorola in May 1997 as a software engineer. He left Motorola in November 2000. In September 2002, Y.T. was rehired by Motorola. He worked in Malaysia on DMR products and was ultimately promoted to Senior Engineer. On June 4, 2008, Y.T. took a leave of absence from Motorola but did not officially resign until October 3, 2008. On or about June 10, 2008, Y.T. began

working for HYTERA in Shenzhen, China as Assistant Director of the Central Research Department, which included HYTERA's DMR development team. At HYTERA, Y.T. reported directly to G.S.

o.    CHIA began working for Motorola on or about August 23, 1999 and was later promoted to Engineering Section Manager. CHIA worked in Malaysia and managed a digital signal processing team for DMR products. CHIA gave notice to Motorola on May 8, 2008 and resigned effective June 7, 2008. On or about June 16, 2008, CHIA began working for HYTERA in Shenzhen, China, managing a DMR software team that reported directly to G.S.

p.    OOI began working for Motorola on or about June 30, 2002 and worked in Malaysia as a software engineer for DMR products. OOI reported to Y.T. at Motorola. OOI gave notice to Motorola on December 2, 2008 and resigned effective January 31, 2009. On or about February 6, 2009, OOI began working for HYTERA in Shenzhen, China, where she updated radio architecture source code libraries for HYTERA's DMR products.

q.    WONG began working for Motorola on or about January 2, 2003 and worked in Malaysia as a Senior Electronics Engineer for DMR products. On or about May 7, 2008, WONG gave notice to Motorola and resigned effective on or about June 23, 2008. On or about June 16, 2008, WONG began working for HYTERA in Shenzhen, China as a technical staff member within the hardware group of HYTERA's DMR division.

4

r.  HOONG began working for Motorola on or about April 28, 2003, working in Malaysia as a Senior Electrical Design Engineer for DMR products. On or about May 8, 2008, HOONG gave notice to Motorola and resigned effective on or about June 7, 2008. On or about June 16, 2008, HOONG began working for HYTERA in Shenzhen, China. WONG was a member of the "Technical Staff" within the hardware group of HYTERA's DMR division.

s.  CHUA began working for Motorola on or about April 1, 2003 and worked in Malaysia as a Senior Electronics Engineer for DMR products. On or about May 14, 2008, CHUA gave notice to Motorola, and resigned effective June 13, 2008. On or about June 13, 2008, CHUA began working for HYTERA in Shenzhen, China as a technical staff member of HYTERA's DMR division.

## Motorola Trade Secret Information

t.  As part of its normal business operations, Motorola created and maintained confidential, proprietary and trade secret information related to its DMR products. This information was not generally known to the public.

u.  Motorola's proprietary, confidential and trade secret information included computer software and hardware used in DMRs.

v.  Motorola's proprietary, confidential and trade secret information included documents and specifications related to matters such as the development, testing and operation of its DMRs.

5

w.   Motorola employees, including computer programmers, developed and modified software for DMRs by writing and altering source code for DMRs.

x.   Motorola DMR trade secrets included, but were not limited to, the following:

i.   DMR software source code (Trade Secret A);

ii.   Design and implementation of radio software operation architecture in DMR systems (Trade Secret B);

iii.   Benchmarking strategies, methods, and results relating to performance testing of DMR software and hardware components (Trade Secret C);

iv.   Design and implementation of squelch technology in DMR systems (Trade Secret D);

v.   Design and implementation of low tier digital connectivity modules and functions in DMR systems (Trade Secret E);

vi.   Frequency generation, transmitter and circuit design techniques for DMR hardware (Trade Secret F);

vii.   Design and implementation of the DMR signaling layer architecture in DMR systems (Trade Secret G);

viii.   Analog functionality features in DMR systems (Trade Secret H);

6

ix.     Design and implementation of Extended Control and Management Protocol (XCMP) in DMR systems for radio control, security, authentication and management functionalities (Trade Secret I);

x.     Design and implementation of the physical layer, ARM and DSP frameworks, and radio signaling architecture in Motorola's repeaters (Trade Secret J);

xi.     Design and implementation of digital two-way DMR radio repeater (Trade Secret K);

xii.     Design and implementation of VOX technology in digital two-way DMR radio systems (Trade Secret L);

xiii.     Design and implementation of the hardware abstraction layer in DMR systems (Trade Secret M);

xiv.     Design and implementation of the L1 Timer, Framer, Frame Scheduler, and synchronization DMR systems (Trade Secret N); and

xv.     Design and implementation of noise suppression technology in DMR systems (Trade Secret O).

**Motorola Used Reasonable Measures to Protect Its Trade Secrets**

y.     Motorola used a number of reasonable measures to protect its DMR trade secrets and its confidential proprietary information, including, but not limited to, the following:

      i.      Motorola maintained a facility in Penang, Malaysia which conducted hardware development (the "Penang Hardware Facility").

      ii.      Employees permitted to enter the Penang Hardware Facility were issued a unique identification badge and employees entering the Penang Hardware Facility had to scan into the facility and pass security guards who had the authority to check bags upon entry and exit.

      iii.      To reach Motorola's research and development department computers in the Penang Hardware Facility, an employee had to swipe an authorized identification badge at three separate access points: the parking lot, the facility's exterior glass door entrance, and an entrance separating the main facility's atrium from its work areas.

      iv.      Motorola maintained a second facility in Penang, Malaysia which conducted software development (the "Penang Software Facility").

      v.      Employees permitted to enter the Penang Software Facility were issued a unique identification badge. Employees had to scan an authorized identification badge to access elevators for Motorola's floors and had to pass by twenty-four hour a day security guards.

      vi.      The Penang Software Facility contained compartmentalized project spaces, which were restricted to employees who worked on teams handling specific projects. These spaces also required scanning an authorized identification badge for access.

8

vii.     Motorola maintained an internal document database which held Motorola's technical, business, and marketing documents (the "Internal Database").

viii.    In order to access certain documents in Motorola's Internal Database, users had to be granted access by a supervisor.

ix.      To access the Internal Database, employees first had to login into the company network with a unique username and password, and then had to separately log into the document repository with a unique username and password.

x.       Documents within Motorola's Database were restricted by the document owner, who could restrict access by document or by document directory location.

xi.      Requests for documents on the Motorola database were routed through a Motorola server in the Northern District of Illinois. If a request was made for Motorola database documents that were locally "cached," or stored for future electronic requests, the network still performed a "checksum" or verification function to ensure that the document was the most recent version. The "checksum" function was also routed through servers in the Northern District of Illinois.

xii.     To obtain remote access to Motorola's network, an employee needed supervisory approval, a Motorola laptop, and a security token, in addition to the logon and password requirements discussed above.

xiii.    Motorola designated certain documents and information as confidential. These designations included, but were not limited to, "Motorola Confidential Restricted;" "Motorola Confidential Proprietary;" and Motorola "Internal Use Only."

xiv.    As part of the hiring process, Motorola employees were required to sign Confidentiality Agreements which required, among other things, that they "not disclose to others, either during or subsequent to employment by Motorola, any confidential information of Motorola," and "upon termination of employment by Motorola, to promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola or any other materials which belong to Motorola."

xv.    The INDIVIDUAL DEFENDANTS each signed Confidentiality Agreements when they were hired by Motorola.

xvi.    Motorola employees received annual refresher trainings, including trainings on the topics covered by the confidentiality agreements and the appropriate use of Motorola computer resources.

xvii.    Motorola conducted exit interviews with certain employees before their employment at Motorola ended. These exit interviews covered topics such as future employment and reasons for leaving Motorola.

xviii.    Motorola conducted exit interviews with each of the INDIVIDUAL DEFENDANTS.

10

xix.     At or around their termination of employment with Motorola, certain Motorola employees signed Non-Disclosure Agreements in which they acknowledged their continuing obligations under the confidentiality agreements described above, and acknowledged their return of all Motorola "property and confidential information . . . in whatever form or media, from your possession to Motorola Management."

xx.     The INDIVIDUAL DEFENDANTS each signed Non-Disclosure Agreements when they left Motorola.

2.     Beginning no later than on or about June 8, 2007 and continuing until at least on or about June 22, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD.,

GEE SIONG KOK,
also known as "Guo Yixiang,"

YIH TZYE KOK,
also known as "Guo Yijie,"

SAMUEL CHIA HAN SIONG,
also known as "Xie Hanxiong,"

PHAIK EE OOI,
also known as "Peiyi Huang,"

WONG KIAT HOE,
also known as "Ken Wong,"

YU KOK HOONG,
also known as "You Guoxiong," and

CHUA SIEW WEI,
also known as "Eunice Chua,"

defendants herein, and others known and unknown to the Grand Jury, did knowingly conspire with each other, and others known and unknown to the Grand Jury to violate Title 18, United States Code, Sections 1832(a)(1), (2) and (3).

### Manner and Means

3. It was part of the conspiracy that HYTERA recruited and hired the INDIVIDUAL DEFENDANTS, who left Motorola to work for HYTERA. At HYTERA's direction and for the benefit of HYTERA and others, the INDIVIDUAL DEFENDANTS took proprietary and trade secret information from Motorola without authorization. Motorola's proprietary and trade secret information was used by HYTERA and the INDIVIDUAL DEFENDANTS to accelerate the development of HYTERA's DMR products. As a result, HYTERA's DMR products relied on and contained Motorola's proprietary and trade secret information. HYTERA's DMR products were subsequently sold in the Northern District of Illinois and elsewhere in the United States. In addition, the DEFENDANTS would and did carry out the conspiracy and effect its unlawful objects through the following manner and means, among others:

a. It was part of the conspiracy that HYTERA recruited the INDIVIDUAL DEFENDANTS while they were employed at Motorola.

b. It was further part of the conspiracy that HYTERA paid the INDIVIDUAL DEFENDANTS higher salaries and benefits than what they received at Motorola.

c. It was further part of the conspiracy that defendants Y.T., CHIA, OOI, WONG, HOONG, and CHUA made false statements to Motorola that concealed their employment or planned employment with HYTERA.

d. It was further part of the conspiracy that G.S., acting with HYTERA's knowledge, on HYTERA's behalf, and for HYTERA's benefit, instructed Motorola employees to take Motorola items and documents related to Motorola DMR technology for use at HYTERA.

e. It was further part of the conspiracy that, acting with HYTERA's knowledge, on HYTERA's behalf, and for HYTERA's benefit, Y.T., CHIA, OOI, WONG, HOONG, and CHUA accessed information in Motorola's document database that contained proprietary and trade secret information related to Motorola's DMR technology.

f. It was further part of the conspiracy that, acting with HYTERA's knowledge, on HYTERA's behalf, and for HYTERA's benefit, Y.T., CHIA, OOI, WONG, HOONG, and CHUA stole, concealed, copied, received and possessed Motorola's trade secret information, without authorization.

13

g.     It was further part of the conspiracy that the INDIVIDUAL DEFENDANTS, while employed by HYTERA, and without authorization, used Motorola documents, including documents containing proprietary and trade secret information to develop HYTERA's DMR products, to train employees and to market DMR products.

h.     It was further part of the conspiracy that HYTERA used Motorola's trade secret information to sell DMR products around the world.

i.     It was further part of the conspiracy that the DEFENDANTS concealed, misrepresented and hid and caused to be concealed, misrepresented, and hidden the existence and the purpose of the conspiracy and the acts done in furtherance of the conspiracy.

## Overt Acts

4.     In furtherance of the conspiracy and to achieve the objects and purposes thereof, the DEFENDANTS committed and caused to be committed the following overt acts, among others, in the Northern District of Illinois and elsewhere:

a.     Beginning in or about June 2007, HYTERA's CEO began recruiting G.S. to work for HYTERA.

b.     Beginning in or about December 2007, HYTERA and G.S. began recruiting other Motorola employees, including Y.T., CHIA, HOONG and CHUA, for employment at HYTERA.

14

c.      G.S. instructed CHIA, Y.T., HOONG, WONG, and CHUA to obtain information about Motorola's DMR products for use at HYTERA.

d.      HYTERA provided the INDIVIDUAL DEFENDANTS with higher salaries and benefits than the INDIVIDUAL DEFENDANTS earned at Motorola.

e.      Beginning in February 2008, CHIA accessed approximately 11,400 documents in the Internal Database that contained Motorola DMR trade secret information, including hundreds of documents that he had never before accessed.

f.      Beginning in February 2008, Y.T. began accessing dozens of documents in a Motorola database that contained Motorola DMR trade secret information, including at least 59 documents that he had never before accessed.

g.      On or about February 21, 2008, CHIA emailed G.S. and Y.T., writing, "Are we going to 'reuse' as much as possible or we need to develop most of them from scratch to avoid patent infringement" and "[i]f want it to be fast and reuse as much as possible from the existing Motorola product, then we may need less headcount. YT and I will discuss about this."

h.      On or about February 22, 2008, CHIA emailed G.S. and Y.T., writing, "GS, YT and I have been working very hard in backing up all the information. We are trying to grab whatever we can. We will surely need some of them when we are there. I think we have a total of 30G [gigabytes of data] now. Do you have

anything in mind that you need while we are still here? Maybe something in [Motorola's Database]. :-) Sam."

          i.     On or about February 22, 2008, Y.T. emailed G.S. and CHIA, writing, "GS, What we can grab for now is all sw [software] related information and trying to get from [Motorola's Database] for general project related information. Any hw [hardware] information you need in particular? we can try to grab from hw as well ...."

          j.     On or about March 3, 2008, HYTERA hosted a recruitment event for CHIA, Y.T., HOONG and CHUA at HYTERA's facility in Penang, Malaysia.

          k.     Beginning no later than March 2008, G.S. informed CHIA, Y.T., HOONG, WONG, and CHUA, that they would be using Motorola's DMR documents and information to develop DMR products for HYTERA.

          l.     Beginning in March 2008, WONG began accessing hundreds of documents in a Motorola database that contained Motorola DMR trade secret information, including hundreds of documents that he had never before accessed.

          m.     In or about May 2008, CHUA accessed hundreds of files on Motorola's document database, over 400 of which were accessed by her for the first time.

          n.     On or about May 23, 2008, CHIA emailed G.S., Y.T., WONG, HOONG, and CHUA to discuss his departure from Motorola and wrote, "It is going to cause a lot of problem as we are technical people and bring along a lot of knowledge.

We have/will signed the NDA [non-disclosure agreement] and some of our lies may cause problems once Motorola finds out."

o.     Beginning no later than October 2008, Y.T. recruited OOI, who was then employed at Motorola, to work for HYTERA.

p.     HYTERA hired the INDIVIDUAL DEFENDANTS.

q.     In October 2008, Y.T. and OOI discussed using Motorola information to develop HYTERA DMR products.

r.     On or about October 1, 2009, OOI sent an email that described HYTERA, writing, "This company setup from purely copying one..haha...buy otehr [sic] ppl radio can copy earlier :p".

s.     In or about January 2009, CHIA and OOI discussed, via email, copying Motorola data for use at HYTERA.

t.     G.S., Y.T., CHIA, OOI, WONG, HOONG, and CHUA discussed, via email, which Motorola documents and technology to access and use at HYTERA.

u.     G.S., Y.T., CHIA, OOI, WONG, HOONG, and CHUA used Motorola documents and technology to develop HYTERA DMR products.

v.     During their Motorola exit interviews, Y.T., CHIA, OOI, WONG, HOONG, and CHUA did not disclose to Motorola that they had been hired by HYTERA.

w.     In or around May 2010, HYTERA began selling DMR products.

17

x.     On or about May 22, 2017, CHIA emailed HYTERA's CEO about "aligning" his story with G.S. and Y.T. in connection with a civil lawsuit brought in the Northern District of Illinois by Motorola against HYTERA alleging theft of Motorola's DMR trade secrets (the "Civil Case").

y.     Y.T., CHIA, HOONG, and OOI stored Motorola items and documents on their HYTERA laptops.

z.     A HYTERA employee testified during a deposition and at trial in the Civil Case that G.S. was fired in the fall of 2018 for refusing to cooperate with HYTERA's internal investigation, when in fact G.S. worked for HYTERA from no later than December 2018, throughout the trial of the Civil Case, to at least June 22, 2020.

aa.     As late as 2019, the INDIVIDUAL DEFENDANTS stored Motorola items and documents in their personal email accounts.

bb.     Through at least November 2019, HYTERA sold DMR products containing Motorola source code in the United States, including in the Northern District of Illinois.

In violation of Title 18, United States Code, Section 1832(a)(5).

18

## COUNTS TWO THROUGH FIVE

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.     Paragraphs 1(a)-(m), (t)-(w), (x)(ii)-(iv) and (vi), and (y) are incorporated here.

2.     On or about the dates set forth below, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD., and

GEE SIONG KOK,
also known as "Guo Yixiang,"

defendants herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess the information identified below, knowing the same to have been stolen and appropriated, obtained, and converted without authorization;

| Count | Beginning no later than | Continuing until at least | Trade Secret |
|-------|------------------------|---------------------------|--------------|
| TWO | February 22, 2008 | August 6, 2019 | D |
| THREE | March 16, 2008 | August 6, 2019 | C |
| FOUR | April 9, 2008 | August 6, 2019 | F |
| FIVE | April 10, 2008 | August 16, 2019 | B |

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

## COUNTS SIX AND SEVEN

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.    Paragraphs 1(a)–(k), (n), (t)-(w), (x)(ii) and (iv), and (y) are incorporated here.

2.    On or about the dates set forth below, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD., and

YIH TZYE KOK,
also known as "Guo Yijie,"

defendants herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess the information identified below, knowing the same to have been stolen and appropriated, obtained, and converted without authorization;

| Count | Beginning no later than | Continuing until at least | Trade Secret |
|-------|-------------------------|---------------------------|--------------|
| SIX   | February 22, 2008       | June 25, 2019             | D            |
| SEVEN | April 10, 2008          | March 14, 2017            | B            |

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

## COUNTS EIGHT THROUGH TEN

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.      Paragraphs 1(a)–(k), (o), (t)-(w), (x)(ii)-(iv), and (y) are incorporated here.

2.      On or about the dates set forth below, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD., and

SAMUEL CHIA HAN SIONG,
also known as "Xie Hanxiong,"

defendants herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess the information identified below, knowing the same to have been stolen and appropriated, obtained, and converted without authorization;

| Count | Beginning no later than | Continuing until at least | Trade Secret |
|-------|------------------------|---------------------------|--------------|
| EIGHT | February 22, 2008 | November 4, 2019 | D |
| NINE | March 16, 2008 | July 22, 2019 | C |
| TEN | April 10, 2008 | July 22, 2019 | B |

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

## COUNTS ELEVEN AND TWELVE

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.     Paragraphs 1(a)–(k), (p), (t)-(w), (x)(iii) and (v), and (y) are incorporated here.

2.     On or about the dates set forth below, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD., and

PHAIK EE OOI,
also known as "Peiyi Huang,"

defendants herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess the information identified below, knowing the same to have been stolen and appropriated, obtained, and converted without authorization.

| Count | Beginning no later than | Continuing until at least | Trade Secret |
|-------|------------------------|---------------------------|--------------|
| ELEVEN | December 7, 2008 | September 17, 2019 | C |
| TWELVE | December 7, 2008 | September 17, 2019 | E |

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

## COUNTS THIRTEEN AND FOURTEEN

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.      Paragraphs 1(a)–(k), (q), (t)-(w), (x)(ii)-(iii), and (y) are incorporated here.

2.      On or about the dates set forth below, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD., and

WONG KIAT HOE,
also known as "Ken Wong,"

defendants herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess the information identified below, knowing the same to have been stolen and appropriated, obtained, and converted without authorization.

| Count | Beginning no later than | Continuing until at least | Trade Secret |
|---|---|---|---|
| THIRTEEN | March 16, 2008 | November 4, 2019 | C |
| FOURTEEN | April 10, 2008 | November 4, 2019 | B |

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

## COUNTS FIFTEEN THROUGH SEVENTEEN

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.      Paragraphs 1(a)–(k), (r), (t)-(w), (x)(ii)-(iii), (vi), and (y) are incorporated here.

2.      On or about the dates set forth below, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD., and

YU KOK HOONG,
also known as "You Guoxiong,"

defendants herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess the information identified below, knowing the same to have been stolen and appropriated, obtained, and converted without authorization.

| Count | Beginning no later than | Continuing until at least | Trade Secret |
|-------|-------------------------|---------------------------|--------------|
| FIFTEEN | March 16, 2008 | October 29, 2019 | C |
| SIXTEEN | April 9, 2008 | November 4, 2019 | F |
| SEVENTEEN | April 10, 2008 | October 29, 2019 | B |

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

## **COUNTS EIGHTEEN THROUGH TWENTY**

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.  Paragraphs 1(a)–(k), (s)-(w), (x)(ii)-(iii), (vi), and (y) are incorporated here.

2.  On or about the dates set forth below, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD., and

CHUA SIEW WEI,
also known as "Eunice Chua,"

defendants herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess the information identified below, knowing the same to have been stolen and appropriated, obtained, and converted without authorization.

| Count | Beginning no later than | Continuing until at least | Trade Secret |
|---|---|---|---|
| EIGHTEEN | March 16, 2008 | March 4, 2020 | C |
| NINETEEN | April 9, 2008 | March 4, 2020 | F |
| TWENTY | April 10, 2008 | March 4, 2020 | B |

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

25

**COUNT TWENTY-ONE**

The SPECIAL NOVEMBER 2019 GRAND JURY further charges:

1.      Paragraphs 1(a)-(s), (t)-(w), (x)(i), and (y), are incorporated here.

2.      Beginning no later than 2008 and continuing until at least September 25, 2019, in the Northern District of Illinois and elsewhere,

HYTERA COMMUNICATIONS
CORPORATION, LTD.,

defendant herein, with the intent to convert a trade secret that was related to a product used in and intended for use in interstate and foreign commerce to the economic benefit of a person other than the trade secret's owner, intending and knowing that the offense would injure Motorola, did knowingly possess and attempt to possess Trade Secret A, knowing the same to have been stolen and appropriated, obtained, and converted without authorization.

In violation of Title 18, United States Code, Sections 1832(a)(3), 1832(a)(4) and 2.

**FORFEITURE ALLEGATION**

1.      Upon conviction of one or more of the offenses alleged in Counts One

through Twenty-Two of this Indictment,

HYTERA COMMUNICATIONS
CORPORATION, LTD.,

GEE SIONG KOK,
also known as "Guo Yixiang,"

YIH TZYE KOK,
also known as "Guo Yijie,"

SAMUEL CHIA HAN SIONG,
also known as "Xie Hanxiong,"

PHAIK EE OOI,
also known as "Peiyi Huang,"

WONG KIAT HOE,
also known as "Ken Wong,"

YU KOK HOONG,
also known as "You Guoxiong," and

CHUA SIEW WEI,
also known as "Eunice Chua"

defendants herein, shall forfeit to the United States pursuant to 18 U.S.C.

§§ 981(a)(1)(C), 1834, 2323 and 28 U.S.C. § 2461, any property, real or personal,

constituting or derived from, the proceeds they obtained directly or indirectly as a

result of the offenses in the Indictment; any property traceable to such property

including, but not limited to a money judgment for a sum of money equal to all of the

proceeds obtained as a result of the offense listed in this Indictment; any property

used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of said violation; and any article, the making or trafficking of which is prohibited under 18 U.S.C. § 1832.

2. If, as a result of any act or omission of the defendants, any property subject to forfeiture:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third person;

  c. has been placed beyond the jurisdiction of the Court;

  d. has been substantially diminished in value; or

  e. has been co-mingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 2323(b)(2), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 1834, and 2323, and Title 28, United States Code, Section 2461.

A TRUE BILL:

_____

FOREPERSON

_____
JOHN C. KOCORAS
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515

28